271 N.J. Super. 439 (1994)
638 A.2d 1322
SUSAN MACZIK, COMPLAINANT-RESPONDENT,
v.
GILFORD PARK YACHT CLUB, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 10, 1994.
Decided February 8, 1994.
*441 Before Judges BAIME, CONLEY and VILLANUEVA.
Robert A. Morley argued the cause for appellant Gilford Park Yacht Club (Charles Peter Hopkins, II, attorney, Mr. Morley, on the brief).
William A. Ward, attorney, argued the cause for respondent Maczik (Mr. Ward, on the brief).
Jeffrey C. Burstein, Deputy Attorney General, argued the cause for respondent N.J. Division on Civil Rights (Fred DeVesa, Acting Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Burstein, on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
Defendant Gilford Park Yacht Club was found by the Director of the Division on Civil Rights to have violated the Law Against Discrimination by denying Susan Maczik membership in its club on the basis of her sex.[1] It does not challenge that finding. Additionally, the Director found that she was as well subjected to a boycott against her business by "officers and members of the Yacht Club." Defendant does not challenge that factual finding either. Rather, the Club claims that any participation in such *442 discriminatory activities was by individual members and/or officers or trustees, not the Club per se and, accordingly, contends that such activities cannot be imputed to the Club. Additionally it claims awards for losses in lottery sales, catering business, and pain and humiliation, are not supported by the record. Finally the Club challenges on various grounds an award of punitive damages. We affirm all but the award of punitive damages and hold that the Director lacks statutory authority to award such damages.
We need not recite in detail the substantial evidence that supports the findings of both the Administrative Law Judge and the Director. As we have indicated, the Club concedes that in violation of N.J.S.A. 10:5-12(f) and (d) it denied plaintiff membership because she was a woman and based upon a 1886 amendment to the Club's bylaws restricting membership to males. And, suffice it to say the record amply supports the ALJ's findings, and the Director's separate findings, that after plaintiff filed a complaint with the Division on Civil Rights, she and her husband were subjected to a series of retaliatory actions, including the boycotting of her delicatessen business and several instances of "verbal threats and other abuse." We see no basis for not deferring to both the ALJ and the Director in their numerous, amply supported, findings. E.g. Clowes v. Terminix Intern. Inc., 109 N.J. 575, 588, 538 A.2d 794 (1988); Gimello v. Agency Rent-A-Car Systems, 250 N.J. Super. 338, 355, 594 A.2d 264 (App.Div. 1991). Our own review of the entire record simply does not leave us "with the feeling that the Director's finding[s] [are] clearly ... mistaken one[s] and so plainly unwarranted that the interests of justice demand intervention and correction...." Clowes, 109 N.J. at 588, 538 A.2d 794 (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)). Moreover there exists ample statutory authority for the compensatory damages. N.J.S.A. 10:5-17; and see Anderson v. Exxon Co., 89 N.J. 483, 502-503, 446 A.2d 486 (1982); Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 413, 301 A.2d 754 (1973); Jackson v. Concord Co., 54 N.J. 113, 126-27, 253 A.2d 793 (1969); Gimello v. Agency Rent-A-Car Systems, 250 N.J. Super. *443 at 366, 594 A.2d 264. See also Shaner v. Horizon Bancorp., 116 N.J. 433, 438, 561 A.2d 1130 (1989).
Substantially for the reasons set forth by the Director in his December 27, 1991, 46-page written decision, supplemented by his March 9, 1992, 15-page written decision, and for the reasons set forth by Administrative Law Judge Futey in his May 13, 1991, 46-page written initial decision, we affirm the award of $4,070 in economic compensatory damages, the award of $10,000 pain and humiliation damages, the statutory treble damages of $12,516 relating to the economic losses, and the statutory penalty of $2,000 imposed pursuant to N.J.S.A. 10:5-14.1a. As to the economic damages, we note that the Director's conclusion, contrary to that of the ALJ, that plaintiff demonstrated not only loss of sales and loss of lottery ticket profits, but loss of catering business as well, was not premised upon any rejection of the ALJ's credibility determinations. It, rather, reflects a view that the six catering jobs she had performed for the club or its members in 1987, which ceased after January 1988 and in response to her complaint, provided sufficient "pattern or regularity" to support an award for loss of profits from that boycotted catering business. Plainly this conclusion is supported by the record and within the Director's expertise.
As to these damages, however, we briefly comment on the Club's belated claim that the evidence is insufficient to impose vicarious liability upon it. The Club did not raise this issue at any point during the proceedings before the ALJ nor prior to the Director's final decision. The issue was not raised until after that decision and within the context of a motion for reconsideration. Thus, it was well within the Director's discretion to reject the issue as "untimely" and to further reject the Club's attempt to raise the issue because it had failed to provide those portions of the transcript which related to that issue. See Matter of Morrison, 216 N.J. Super. 143, 158, 523 A.2d 238 (App.Div. 1987).
*444 In any event, the Director did consider the issue substantively and said:
there has been established sufficient evidence on the record to hold the Yacht Club liable for the economic damages resulting from the boycott against Maczik's delicatessen in view of the fact that the club's officers and key members personally organized and promoted such boycott. The ALJ found, and the Director adopted his findings that, Joseph Piotrowski, an officer of the club, "was the major instigator in attempting to destroy Maczik" and used "whatever power he had at his command" to "exhort others to carry out "similar sex discrimination actions" against her. Susan Maczik v. Gilford Park Yacht Club, supra, slip op. at 12-19, 37 [1991 WL 415520]. He was part of a "hard-core of antagonists who were `hell-bent on humiliating and destroying' her `by whatever means' and who `conducted a malicious and deliberate campaign' against her." Id. Based on the Director's prior findings that the club, through its officers and members, instituted and engaged in the boycott against her, the Director concludes that the club is liable to Maczik for her damages resulting from such boycott.
There was ample evidence to support these findings. Moreover, we note that there was evidence that the actions and involvement of the Club's trustees and officers was not simply limited just to Joseph Piotrowski or one or two other trustees or officers acting in their individual capacities. In admitted response to Susan Maczik's complaint, the Board of Trustees ordered her husband to appear before it and answer charges, including that he allowed his wife to act contrary to the best interest of the Club. The Board found him guilty of the charges and fined him $50 and, when he failed to pay the fine, removed his boatslip and membership privileges. Further, as to one of the more egregious acts of abuse, i.e. the Monetti bachelor party incident, Monetti testified that the Club had conducted a special meeting of its officers to consider whether to permit the party when it was discovered complainant would be catering. After the special meeting, he was told to get his food someplace else. When he refused, he was warned to get a police escort. Additionally, Joseph Simpson, whose family had been members for 40 years, and who had questioned "the Club leadership" about the status of the civil rights complaint at the monthly general membership meetings and voiced concern about the treatment of the Macziks, was "finally told that he was an `asshole' and to sit down." When Simpson wrote a letter to the Club's attorney in February 1990 expressing *445 concern over the Club's handling of the complaint, he was charged with "conduct unbecoming a member," found guilty, fined $50, assessed a $4500 lawyers' fee for the Club's attorney and barred from entry to the dock area.
There was, thus, ample evidence to establish sufficient involvement on the part of the Club to justify the award of compensatory damages against it. Although within the context of vicarious liability of an employer in a hostile workplace sexual harassment claim, we think the following principles governing such liability are applicable:
An employer will be found vicariously liable if the supervisor acted within the scope of his or her employment. Moreover, even if the supervisor acted outside the scope of his or her employment, the employer will be vicariously liable if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship. Thus, an employer can be held liable for compensatory damages stemming from a supervisor's creation of a hostile work environment if the employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment. An employer may also be held vicariously liable for compensatory damages for supervisory sexual harassment that occurs outside the scope of the supervisor's authority, if the employer had actual or constructive notice of the harassment....
[Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 624, 626 A.2d 445 (1993)].
Here, complainant's exclusion from Club membership as a result of her sex was the result of direct involvement on the part of the Club through its illegal 1986 by-law amendment restricting membership to men. That it was as well most likely directly involved in the retaliatory actions, moreover, can be reasonably inferred from the other official actions it took, including the charges and actions taken against complainant's husband, as well as the actions taken to pursuant to a special meeting of the officers to force Monetti not to use complainant to cater his party, and the actions taken against Simpson when he persisted in his inquiries concerning the complaint. Further, if the retaliatory activity was not the result of direct board action, it is inconceivable that the board did not know of it. At the least, it should have known, yet failed to prevent the "deliberate concerted effort to put her out of business *446 and ... subjecting her to demeaning and threatening verbal harassment for seeking membership and otherwise opposing the club's discriminatory membership policies." There was ample basis for imposing liability upon it for the compensatory damages.
Punitive damages, on the other hand, are distinct from compensatory damages, require a greater threshold basis, and are assessed only when the wrongdoer's conduct is "especially egregious." Leimgruber v. Claridge Associates, Ltd., 73 N.J. 450, 454, 375 A.2d 652 (1977). Unlike compensatory damages, punitive damages under LAD can be imputed to an employer or other entity only "in the event of actual participation by upper management or willful indifference." Lehmann, 132 N.J. at 625, 626 A.2d 445.
But we need not determine here whether the record would support the award of $5,000 against the Club for punitive damages.[2] We conclude the Director does not have the statutory authority to award such damages.
Preliminary, we note that all parties, including the Division, concede that prior to the 1990 amendments to the act (L. 1990, c. 12) the statutory authority accorded the Director of the Division on Civil Rights to remedy a finding of illegal discrimination, did not include imposing common law punitive damages. Certainly the particular provision, N.J.S.A. 10:5-17, enabling the Director to take remedial, affirmative action did not so provide. To be sure, the Legislative's evident intent to create "an effective enforcement agency which would serve towards eradication of `the cancer of discrimination' and whose remedial actions would serve not only the interest of the individual involved but also the public interest", Zahorian, 62 N.J. at 412, 301 A.2d 754, has led to a liberal and *447 expansive view of the breadth of the Director's remedial powers. In Jackson v. Concord Company, 54 N.J. at 126-127, 253 A.2d 793, N.J.S.A. 10:5-17 was construed to include the power to award compensatory damages in the form of economic loss. And the power to award compensatory damages was further held to encompass an award for pain and suffering in Zahorian, 62 N.J. at 413, 301 A.2d 754. And see Andersen v. Exxon Co., 89 N.J. at 502-03, 446 A.2d 486 ($500 award for emotional distress upheld); Director, Div. on Civil Rights v. Slumber, Inc., 166 N.J. Super. 95, 104-105, 398 A.2d 1345 (App.Div. 1979), modified, 82 N.J. 412, 413 A.2d 603 (1980) ($1,500 award for humiliation upheld); Harvard v. Bushberg Bros. Inc., 137 N.J. Super. 537, 541, 350 A.2d 65 (App. Div. 1975), certif. granted, 71 N.J. 493, 366 A.2d 649 (1976) (dismissed by stipulation) ($2,170 compensatory award and $1,000 humiliation award upheld). See also Gimello v. Agency Rent-A-Car Systems, 250 N.J. Super. at 366, 594 A.2d 264 ($10,000 pain, humiliation and suffering award). But see Castellano v. Linden Bd. of Educ., 79 N.J. 407, 411, 400 A.2d 1182 (1979) (record did not provide a "substantial basis" for $600 humiliation, pain and mental suffering award).
The authority to award compensatory damages, however, is not without limitation. In Jackson, the award of money damages was seen as "incidental relief." 54 N.J. at 126, 253 A.2d 793. Economic loss was considered similar to the award of back pay, expressly provided for in N.J.S.A. 10:5-17. Such loss was also considered to be directly related to the authority given the Director "to use reasonably certain bases, including but not limited to list, catalogue or market prices or values, or contract or advertisement terms and conditions, in order to determine particulars or performance in giving appropriate remedy." 54 N.J. at 127, 253 A.2d 793. Relying on that language, Justice Hall said "[w]e believe that it is clear evidence that the Legislature assumed the Director had the power to award such recompense by reason of the previously quoted general language of the section." Id. at 128, 253 A.2d 793.
*448 And, while a more general compensatory award for pain and suffering was also found to be within the Director's remedial powers in Zahorian, the court was careful to characterize such power as the power to grant "minor or incidental" pain and suffering. 62 N.J. at 413, 301 A.2d 754. The limited nature of such award is reflected by the court's rejection in Zahorian of the contention that the power to grant an award for pain and suffering "may ultimately lead to substantial claims for `serious and permanent physical or mental disability' which would entail extensive adversary litigation `better reserved to traditional court proceedings.'" Ibid. In doing so, the court observed:
But it would seem entirely evident that the recognition of administrative authority to make minor or incidental awards need not carry with it any authority to entertain a matter where, because of the severity of the consequential injury and the extensiveness of the claim, the item of damages has become primary and the other relief incidental rather than the reverse. Surely there is nothing incompatible in concluding that while the Legislature contemplated that the Director would have authority to award compensatory damages for pain and suffering as well as economic loss, his authority would be confined to an award which truly constituted only `incidental relief' (Jackson, supra, 54 N.J. at 126, 253 A.2d 793) rather than a primary item.
[Zahorian, 62 N.J. at 413, 301 A.2d 754 (emphasis added)].
Accord Shaner v. Horizon Bancorp, 116 N.J. at 439, 561 A.2d 1130 ("the Court has recognized that the Director's broad remedial powers can include the power to grant forms of legal relief such as compensatory damages ... as well as incidental damages for pain and suffering or personal humiliation.... Nevertheless, the administrative award of monetary damages should not be `a primary item' of relief ... but must be only ancillary to and correlated with the grant of broader remedies, which in combination are `reasonably calculated to eliminate the effects of the discrimination.'" citations omitted).[3]
*449 Punitive damages are distinct from compensatory damages. As we observed recently, "[p]unitive damages reflect the importation of criminal law principles of punishment into the field of tort law.... Such damages constituted `a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine.'" Herman v. Sunshine Chemical Specialties, Inc., 257 N.J. Super. 533, 539, 608 A.2d 978 (App.Div. 1992), rev'd on other grounds, 133 N.J. 329, 627 A.2d 1081 (1993) (citations omitted). Regardless of the extent of the Director's statutory authority to award incidental compensatory damages as a remedial measure, that authority was never extended to punitive damages prior to 1990. Cf. Lally v. Copygraphics, 173 N.J. Super. 162, 179, 413 A.2d 960 (App.Div. 1980), aff'd, 85 N.J. 668, 428 A.2d 1317 (1981) (compensatory remedy of lost wages and reinstatement available in a retaliatory discrimination administrative proceeding pursuant to N.J.S.A. 34:15-39.1 does not encompass an award of common law punitive damages). As we have said, the Director so concedes.
That leaves us, then, to resolve whether the 1990 amendments to the act extended the Director's remedial powers to encompass punitive damages. The critical amendments were enacted in direct response to Shaner v. Horizon Bancorp., supra, which concerned the nature and scope of the superior court discrimination complaint proceeding pursuant to N.J.S.A. 10:5-13 which is afforded those victimized by discriminatory conduct as an alternative remedy to a complaint filed with the Director of the Division on Civil Rights. In that case the Supreme Court had construed the civil suit remedy as comparable to the administrative remedy and, thus, primarily remedial and equitable in nature and for which there was no right to a jury trial. In response, N.J.S.A. 10:5-13 was amended to provide in pertinent part:
Any person claiming to be aggrieved by an unlawful employment practice or an unlawful discrimination may, personally or by an attorney-at-law, make, sign and file with the division a verified complaint in writing which shall state the name and address of the person, employer, labor organization, employment agency, owner, lessee, proprietor, manager, superintendent, or agent alleged to have committed the unlawful employment practice or unlawful discrimination complained of and *450 which shall set forth the particulars thereof and shall contain such other information as may be required by the division. Upon receipt of the complaint, the division shall notify the complainant on a form promulgated by the director of the division and approved by the Attorney General of the complainant's rights under this act, including the right to file a complaint in the Superior Court to be heard before a jury; of the jurisdictional limitations of the division; and any other provisions of this act, without interpretation, that may apply to the complaint. The Commissioner of Labor, the Attorney General, or the Commissioner of Education may, in like manner, make, sign and file such complaint. Any employer whose employees, or some of them, refuse or threaten to refuse to co-operate with the provisions of this act, may file with the division a verified complaint asking for assistance by conciliation or other remedial action.
Any complainant may initiate suit in Superior Court under this act without first filing a complaint with the division or any municipal office. Upon the application of any party, a jury trial shall be directed to try the validity of any claim under this act specified in the suit. All remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any provided by this act or any other statute. Prosecution of such suit in Superior Court under this act shall bar the filing of a complaint with the division or any municipal office during the pendency of any such suit.
[Emphasis added].
The above underlined portions were added to N.J.S.A. 10:5-13 by the amendments to grant the right to a jury trial in a civil suit and, in response to the primarily equitable nature of the proceedings as construed by Shaner, expressly authorize common-law tort remedies. Correspondingly, the amendments also add the requirement that when a complaint is filed with the Division, the complainant must be notified of the available rights under the act, including the right to file a Superior Court action "to be heard before a jury," and must as well be notified "of the jurisdictional limitations of the division."
Contextually, the particular amendments to N.J.S.A. 10:5-13 do not support even an inference that the Legislature intended not only to expand the nature and availability of remedies in a Superior Court action, but as well to similarly expand the powers of the Director. The pertinent amendatory language address itself solely to the civil litigation proceeding. Significantly, when the Legislature added the requirement that the Director notify a complainant of that option, it also required that the complainant be advised of the "jurisdictional limitations of the division." Given *451 the breadth of the Director's remedial powers otherwise provided pursuant to N.J.S.A. 10:5-17, the only real jurisdictional limitation relates to the incidental nature of an administrative compensatory damage award and absence of common-law punitive damages. If the Legislature had intended N.J.S.A. 10:5-13 to expand the Director's power to include the common-law tort remedies, there would be little, if any, need to advise a complainant of jurisdictional limits. Requiring such advice reflects an awareness that the remedies available through the Director are not comparable to those available through a civil proceeding.
Moreover, N.J.S.A. 10:5-17 was not changed, altered or amended in any way. Presumably, the Legislature was aware that the Director could not award punitive damages under that statute at the time of the 1990 amendments. The absence of any change in the remedy provision of N.J.S.A. 10:5-17 strongly suggests a conscious intent not to alter the scope of those remedial powers.
In this respect, we take note of S. 2092 which, as initially proposed in 1990, included an amendment to N.J.S.A. 10:5-17 that would have expressly empowered the Director to award punitive damages up to $10,000 and would have provided specific criteria governing such awards. We recognize that, as finally enacted as S. 340, the bill deleted any reference to N.J.S.A. 10:5-17 and does not appear to relate to the critical LAD amendments we here consider. But the existence of such proposed amendment and its apparent death in the legislative process is some further indicia of legislative intent to broaden the remedies available in a court proceeding but not those available through the Director.
In reaching this conclusion, we are not oblivious to the additional 1990 amendment to N.J.S.A. 10:5-3 adding as a Legislative finding that people subject to discrimination suffer various personal hardships and that "[s]uch harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available *452 under the laws of this State." But the recitation that the act be liberally construed is simply a codification of what had been consistently judicially recognized. See Shaner, 116 N.J. at 438-439, 561 A.2d 1130. And certainly the expressed intent that "such damages," i.e. common law remedies, be available to all protected persons is expansive. But the intent is focused upon making such remedies available  not making them available in all proceedings. Moreover, N.J.S.A. 10:5-13 makes the common law remedies available to "prevailing plaintiffs." That term ordinarily refers to successful civil litigants, not complainants in an administrative proceeding.
We further acknowledge that in concluding that a plaintiff in a civil proceeding was not entitled to a jury trial, the court in Shaner stressed the similarity of the administrative remedies and civil litigation remedies, observing "the judicial cause of actions under the LAD is similar in purpose and effect to an administrative action," 116 N.J. at 441, 561 A.2d 1130. One might suggest that, therefore, when the Legislature broadened the remedies available in the latter forum, it correspondingly broadened the remedies in the other proceeding by implication. But one just as easily could point out that because Shaner recognized the limited nature, vis-a-vis common law remedies, of available administrative remedies, the Legislature's decision to expand only the civil proceeding, where such remedies are traditionally afforded, was intentional. Cf. Shaner, 116 N.J. at 441, 561 A.2d 1130 ("court actions can allow more extensive individual relief in terms of monetary damages than might otherwise obtain in an administrative proceeding.").
Moreover, the administrative proceeding and civil proceeding are not identical. The former is designed to afford a complainant with a means of redress that is "normally swifter and less expensive than formal litigation." E.g. Sprague v. Glassboro State College, 161 N.J. Super. 218, 226, 391 A.2d 558 (App.Div. 1978). Unlike a superior court complaint, for instance, all complaints filed with the division require "an initial culling-out process" to determine *453 probable cause for the complaint. N.J.S.A. 10:5-14. If probable cause is found, the statute requires "an immediate endeavor" to remove the discrimination "by conference, conciliation and persuasions." Additionally, while common law punitive damages are not available, the Director can award treble economic damages for certain discriminatory conduct and can assess statutory penalties. We do not read the act to provide for such measures within the context of a civil proceeding.
Thus, while a complainant may give up certain potentially greater damage awards by proceeding with an administrative complaint, the result obtained may be swifter, less costly, and include some forum of punitive measure in the form of treble economic damages where such damages are sustained. We see nothing illogical or unfair about such choices. Furthermore, as to that choice, "[w]hile a claimant may pursue only one remedial route at a time, he or she may seek alternative or successive vindication." Shaner, 116 N.J. at 440, 561 A.2d 1130.
Finally, although not in any way bound by out-of-state cases, we take note of the fact that other jurisdictions have consistently held that unless the pertinent statutory authority so expressly provides, an administrative agency may not award punitive damages in an administrative civil rights proceeding. In doing so, we think it significant that in all of these jurisdictions this is so notwithstanding the unanimous view that discrimination laws must be liberally construed. See e.g. McDaniel v. Cory, 631 P.2d 82, 86-89 (Alaska 1981); Dyna-Med., Inc. v. Fair Employment and Housing Commission, 43 Cal.3d 1379, 1393 743 P.2d 1323, 1328-31, 241 Cal. Rptr. 67, 74 (1987); Indiana Civil Rights Comm'n. v. Washburn Realtors, Inc., 610 N.E.2d 293, 297 (Ind. Ct. App. 1993); Chauffeurs, Teamsters and Helpers, Local Union No. 238 v. Iowa Civil Rights Com'n, 394 N.W.2d 375, 384 (Iowa 1986); Woods v. Midwest Conveyors Co., Inc., 231 Kan. 763, 775, 648 P.2d 234, 245 (1982); Cullen v. Nassau County Civil Service Comm'n, 53 N.Y.2d 492, 497-498, 425 N.E.2d 858, 861, 442 N.Y.S.2d 470, 473 (1981); N.Y. State Office of Mental Retardation and Developmental Disabilities *454 v. N.Y. State Division of Human Rights, 183 A.D.2d 943, 944, 583 N.Y.S.2d 580, 581 (N.Y. App. Div. 1992); Ohio Civil Rights Comm'n v. Lysyj, 38 Ohio St.2d 217, 313 N.E.2d 3, 6-7 (1974), cert. denied, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975); Bishop Coal Company v. Salyers, 181 W. Va. 71, 78, 380 S.E.2d 238, 246 (1989).
The Director's order is affirmed in all respects, except the award of punitive damages. That award is vacated and the matter is remanded to the Director for the entry of an amended order consistent with our opinion.
NOTES
[1] Defendant concedes it is a place of public accommodation for the purposes of LAD and so stipulated below. We express no view as to that.
[2] The Club does not challenge the statutory penalty of $2,000 imposed pursuant to N.J.S.A. 10:5-14.1a, or the statutory trebling of the economic damages pursuant to N.J.S.A. 10:5-17 and 10:5-12(1) and (n), except to argue that the latter constitutes duplicative penalties. Since we have determined that the Director does not have authority to award general punitive damages, that contention is moot.
[3] We note in this respect that most administrative awards for pain and suffering or emotional harm that have been upheld include a "moderate" $500 (Andersen, supra), $1500 (Slumber, supra), $5,000 (Frank v. Ivy Club, 120 N.J. 73, 93, 111, 576 A.2d 241 (1990), and $10,000 (Gimello v. Agency Rent-A-Car, Systems, supra). We uphold here a similar award of $10,000, but consider that amount as approaching, if not at, the limit of an "incidental" award.