CHARLES P. JACKSON, COMPLAINANT, v. CONCORD COMPANY, A CORPORATION OF NEW JERSEY, t/a HARTFORD ARMS, JOSEPH SAMOST, JUNE ADAMS AND EVELYN O'DONNEL, RESPONDENTS-CROSS-APPELLANTS, AND NEW JERSEY DIVISION ON CIVIL RIGHTS, APPELLANT-CROSS-RESPONDENT.

Argued January 6 and 7, 1969—Decided June 2, 1969.

114

Mr. *Peter P. Green* argued the cause for respondents-cross-appellants (Mr. *Robert T. Healey,* attorney; Mr. *Green,* on the brief).

Mr. *Stephen Skillman,* Deputy Attorney General, argued the cause for appellant-cross-respondent, New Jersey Division on Civil Rights (Mr. *Arthur J. Sills,* Attorney General of

New Jersey, attorney; *Mr. Skillman,* of counsel and on the brief).

*Mr. Sol Rabkin* of the New York bar argued the cause for *amici curiae* (*Mr. Vincent E. Fiordalisi,* attorney for *amici curiae* New Jersey Committee against Discrimination in Housing and National Committee against Discrimination in Housing; *Mr. Allan L. Tumarkin,* attorney for *amicus curiae* New Jersey Regional Advisory Board of the Anti-Defamation League of B'nai B'rith; *Mr. Fiordalisi* and *Mr. Rabkin,* of counsel).

The opinion of the court was delivered by

HALL, J. This rental housing discrimination case is here on our grant of cross petitions for certification by the Division on Civil Rights ("Division"), and the corporate property owner along with its named individual representatives ("respondents"). 52 *N. J.* 173 (1968).

The Director of the Division, adopting the recommendations of the hearing examiner, found that respondents had denied the complainant Jackson, a Negro, the equal opportunity to lease an apartment, admittedly constituting real property within the coverage of the Law Against Discrimination (*N. J. S. A.* 10:5–1 to 28, formerly *N. J. S. A.* 18:25–1 to 28), in violation of section 10:5–12, *subd. g* (formerly *N. J. S. A.* 18:25–12, *subd. g*) of that statute.[1]

---

[1] Section 10:5–12, *subd.* g in pertinent part provides:

"It shall be * * * an unlawful discrimination:

\*      \*      \*      \*      \*      \*      \*      \*

"g. For the owner, lessee, sublessee, assignee or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent, lease, assign, or sublease any real property or part or portion thereof, or any agent or employee of any of these:

"(1) To refuse to sell, rent, lease, assign, or sublease or otherwise to deny to or withhold from any person or group of persons any real property or part or portion thereof because of the race, creed, color, national origin or ancestry of such person or group of persons; [subject to certain exceptions in *N. J. S. A.* 10:5–5, subd. n not here involved]

\*      \*      \*      \*      \*      \*      \*      \*"

The Director entered remedial orders, which included a provision that complainant was entitled to recover compensatory damages from respondents equal to the increased rental and travel expenses resulting from his having to live elsewhere. The order directed the exact amount of these damages to be determined after complainant commenced the tenancy respondents were required by the order to furnish him.

The Appellate Division, on respondents' appeal, affirmed the orders of the Director except as to the holding of the right to damages for economic loss.[2] In that connection the court concluded that the statute does not authorize the Director to award damages in a housing discrimination case. 101 *N. J. Super.* 126 (1968). The Division here attacks that holding, which is the novel and important question before us. Respondents challenge, as they did in the Appellate Division, the sufficiency of the proofs of unlawful discrimination and the validity of various other provisions of the remedial orders.

At the outset we may say that the proofs before the Division clearly established an unlawful discrimination in violation of the statute, and respondents' contention of insufficiency of the evidence is without merit. The conclusion of the Appellate Division that "the finding of discrimination is fully supported by the record" is solidly grounded in the established standard of judicial review of factual determinations of administrative bodies: " 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering 'the proofs as a whole,' with due regard to the opportunity of the one

---

[2] The appeal was defended by the Attorney General as attorney for the Division (see *N. J. S. A.* 10:5–25), who likewise represents the complainant's interests as well as the Division's in this court. See *N. J. S. A.* 10:5–16: "The case in support of the complaint shall be presented before the director by the attorney for the division. * * * In the discretion of the director, the complainant may be allowed to intervene and present testimony in person and may be represented by counsel. * * *"

who heard the witnesses to judge of their credibility * * * and * * * with due regard also to the agency's expertise where such expertise is a pertinent factor," *Close v. Kordulak Bros.*, 44 *N. J.* 589, 599 (1965). Indeed, any other conclusion at the agency or appellate levels would have been a gross miscarriage, and this even though the evidence was largely circumstantial (*cf. Clover Hill Swimming Club v. Goldsboro*, 47 *N. J.* 25 (1966); *Fraser v. Robin Dee Day Camp*, 44 *N. J.* 480 (1965)), in that there was no direct proof of announced landlord policy or outright rejection of complainant as a tenant by reason of his race (*Jones v. Haridor Realty Corp.*, 37 *N. J.* 384, 389 (1962); *cf. Evans v. Ross*, 57 *N. J. Super.* 223 (*App. Div.* 1959), certification denied 31 *N. J.* 292 (1959)).

Complainant was a teacher in the community high school at Runnemede, Camden County. His wife was studying to be a teacher. They had no children. In the summer of 1967, respondent Samost, through an assortment of corporations, was constructing a garden apartment complex in that community called Hartford Arms and soliciting tenants. He was the president, principal stockholder and controlling spirit of these corporations, as well as occupying a similar position in other corporate entities engaged in like enterprises in the general area. Respondent Adams was his secretary, a corporate officer, minority stockholder, and active in the business operations. Respondent O'Donnel became the rental agent at Hartford Arms on August 4, 1967.

On July 7th of that year, complainant applied to the then rental agent at Hartford Arms (who testified in his behalf) for a one-bedroom apartment on the quoted terms of a two-year lease commencing September 1 at a rental of $115 per month. There is no question but that his salary and credit standing were such as to make him a financially able tenant. He made a deposit, and was to return with his wife in a week to select the particular apartment and the color of the carpeting they desired. Commencing on that return visit and on numerous further visits during the next month, in

addition to telephone inquiries, complainant was met with a succession of incredible excuses and evasive replies about the status of his application, a tactic obviously designed to discourage him from pursuing the rental. As we have said on other occasions, a profit-making business could not possibly survive if all potential customers were treated as this complainant was. *Clover Hill Swimming Club v. Goldsboro, supra,* 47 *N. J.,* at 37; *Fraser v. Robin Dee Day Camp, supra,* 44 *N. J.,* at 484.

Finally, on August 14, Jackson filed a complaint with the Division which led to a full hearing in October. The proofs presented on both sides, including accounts of conduct by respondents Samost and Adams (who did not testify in denial thereof) in connection with treatment of the application, called for the conclusion of the hearing examiner "that complainant was denied the equal opportunity to rent an apartment in the Hartford Arms and that this denial was effected by a deliberate policy of delay, hindrance, excuses, evasions and antagonism virtually amounting to outright rejection by respondent Samost, his employees, and the corporations under his control, because complainant was a Negro." Certainly the policy and requirements of the Law Against Discrimination cannot be thwarted by any kind of indirection and attempted subtlety. Dilatory or evasive conduct toward a member of a class which the statute is designed to assist and protect is a badge of unlawful discrimination. Although the burden of persuasion by a preponderance of the evidence rests with the complainant throughout, when such a course of conduct appears a strong case is made out, and a respondent has a heavy task to justify his actions. The effort of these respondents was indeed feeble and utterly unconvincing.

Meanwhile, on September 1st, complainant had to seek other living quarters in order to be accessible to his school, which was about to open. He took up residence in a motel in Camden at a monthly rent of $216.30, $101.30 over the quoted apartment rent of $115. In addition he had to drive

20 miles per day round trip to work, whereas he could have walked to the school if he resided in Hartford Arms.

The Director's order, entered November 21, 1967, had two aspects. One dealt with private relief to complainant. Speaking generally, it ordered the corporate and individual respondents, their officers, agents and employees, to cease and desist from discriminating against complainant because of race with respect to leasing apartments at Hartford Arms "or any other apartments now or hereafter owned, controlled or managed either by any of said respondents or by any corporation now or hereafter controlled or owned by the individual respondents, Joseph L. Samost and June Adams." Specifically, it directed the named respondents, within seven days, to provide the Division with a verified list of all Hartford Arms apartments then available for rent or to become so by January 1, to show such apartments to complainant, to offer to rent whichever one he chose, to enter into a two-year lease with him, at $115 per month, on the same conditions offered all other applicants as of July 7 and to report the details of compliance to the Division. Respondents were further ordered to reimburse complainant for the additional rental and travel expenses (at the rate of 10 cents per mile) previously referred to after the definite fixing of the amount following the commencement of his lease. The Division retained jurisdiction to issue supplemental orders in connection with these specific provisions.

To complete the factual picture shown by the record, respondents thereafter advised the Division that there were no apartments in the project then available or to become available by January 1, although apparently it had been stipulated near the beginning of the proceedings that the status quo would be maintained to the extent of having a suitable apartment available for complainant if he were successful in the cause. The Director then undertook an investigation to verify respondents' position. While access to their records was denied him, the investigation disclosed that the model apartment was vacant. The Director issued a supplemental

order on December 7 directing respondents to lease that accommodation to complainant, on the same terms, for occupancy January 1, if none other was available. Another apartment was shortly found and a lease was entered into, but, as we understand it, at a higher rental and for a shorter period.

The other aspect of the Director's original order is of broader scope and goes beyond relief to the complainant. It required respondents, their officers, agents and employees, to cease discriminating *against all persons* because of race with respect to leasing apartments at Hartford Arms and any other apartments now or hereafter owned, controlled or managed by respondents or by any corporation controlled by Samost or Adams, as well as to desist from all other acts, practices, policies or conduct prohibited by *N. J. S. A.* 10 :5–12, *subd.* g. Respondents were further directed to issue notice of the order and written instructions to their agents and employees for compliance, and to post at appropriate places on the various premises owned or controlled by them for a period of one year, copies of the instructions and the Director's orders, together with the official housing poster of the Division. Additionally they were required to make available to the Division for inspection during the same period all records and applications concerning vacancies at Hartford Arms and the dispositions of such vacancies, as well as copies of the rental or lease arrangement made for each.

Respondents' particular challenge to the remedial provisions of the Director's order relates, apart from the award of damages for additional rental and travel expenses, to those portions directed to the future conduct of the individual respondents, as distinct from the corporate owner, and to the mandates concerning posting and inspection of records just outlined. Essentially their complaint is that these directions go beyond the delegated powers of the agency and the legislative intent. We agree completely with the Appellate Division here, 101 *N. J. Super.*, at 130–131, and in *Robinson v. Branch Brook Manor Apartments,* 101 *N. J. Super.* 117 (*App. Div.* 1968), certification denied 52 *N. J.* 487

(1968), that such provisions are entirely valid for the reasons expressed in those opinions. We feel it desirable, however, to add some further comments, in view of the failure of respondents, at this relatively late date in the history of the legislation, to appreciate the strength of the public policy implemented by the statute, the breadth and purpose of its provisions, and the import of this court's prior decisions.

Since the inception of the Law Against Discrimination in *L.* 1945, *c.* 169, the act has begun with this statement:

"The enactment hereof shall be deemed an exercise of the police power of the State for the protection of the public safety, health and morals and to promote the general welfare and in fulfillment of the provisions of the Constitution of this State guaranteeing civil rights." (*N. J. S. A.* 10:5-2),

Followed by this strong legislative determination:

"The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age or because of their liability for service in the Armed Forces of the United States, are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundations of a free democratic State." (*N. J. S. A.* 10:5-3).

It then, in present form, declares to be a civil right the opportunity to obtain employment, and all the accommodations, advantages, facilities and privileges of any places of public accommodation, publicly assisted housing accommodation and other real property without discrimination. *N. J. S. A.* 10:5-4.[3]

---

[3] Originally the right was limited to the opportunity to obtain employment. *L.* 1945, *c.* 169, § 4. The Legislature has steadily expanded coverage. The act was amended to include places of public accommodation by *L.* 1949, *c.* 11, § 2, housing built with public funds by *L.* 1954, *c.* 198, § 1, publicly assisted housing accommodations by *L.* 1957, *c.* 66, § 1, and other specified housing by *L.* 1961, *c.* 106, § 1 and *L.* 1966, *c.* 17, § 1.

The strength of the State's policy has frequently been spoken of. See *Levitt & Sons, Inc. v. Division Against Discrimination,* 31 *N. J.* 514, 524 (1960), appeal dismissed, 363 *U. S.* 418, 80 *S. Ct.* 1257, 4 *L. Ed. 2d* 1515 (1960); *Jones v. Haridor Realty Corp., supra* (37 *N. J.,* at 392–393); *Pfaus v. Palermo,* 97 *N. J. Super.* 4, 8 (*App. Div.* 1967).[4]

We have particularly pointed out that, by reason of the legislative findings, "* * * prevention of unlawful discrimination vindicates not only the rights of individuals but also the vital interests of the State. In short, such discrimination is regarded as a public wrong and not merely the basis of a private grievance." *David v. Vesta Co.,* 45 *N. J.* 301, 327 (1965).

The extensive powers granted to the Division by the original act and subsequent amendments reflect the broad thrust of the fundamental policy. By *N. J. S. A.* 10:5–6, the Division of Civil Rights, now in the Department of Law and Public Safety, is given "power to prevent and eliminate discrimination in the manner prohibited by this act against persons" and "to take other actions against discrimination * * * as herein provided" with "general jurisdiction and authority for such purposes."

Furthermore, not only may any individual claiming to be aggrieved by unlawful discrimination file a complaint against the person allegedly wronging him, but the Com-

---

[4] Originally the statute expressly provided that "the provisions of this act shall be construed liberally for the accomplishment of the purposes thereof." *L.* 1945, c. 169, § 26. This sentence, by *L.* 1949, c. 11, § 19, was changed to its present form (*N. J. S. A.* 10:5–27): "The provisions of this act shall be construed fairly and justly with due regard to the interests of all parties." We can locate no legislative history as to the reason for the change. In view of the constitutional provisions and the original legislative findings and declarations and the fact that our statute is basically remedial and not penal in nature, we construe the change in this section to mean no more than that the Division shall not be a biased agency and that all parties must act in good faith for the evenhanded accomplishment of the salutary purposes of the act. See *Evans v. Ross, supra* (57 *N. J. Super.,* at 231).

missioner of Labor and Industry, the Commissioner of Education and the Attorney General himself (the executive of the Division) may also make complaints against violators. *N. J. S. A.* 10:5–13. We assume this latter authority is utilizable not only where a wronged individual declines to complain but also in situations where the alleged unlawful conduct is more general. And now, by *L.* 1966, *c.* 17, § 6, *N. J. S. A.* 10:5–14.1, the Attorney General is empowered, after the filing of any complaint, to proceed against any person in a summary manner in the Superior Court to compel compliance, to prevent violations, attempts thereat or attempts to interfere with or impede enforcement of or the exercise or performance of any power or duty under the act.

*N. J. S. A.* 10:5–17, dealing with the order the Director may issue upon a finding of unlawful discrimination, authorizes remedies directed to both the private and public aspects of the wrong. It presently provides in pertinent part:

"If, upon all evidence at the hearing the director shall find that the respondent has engaged in any unlawful employment practice or unlawful discrimination as defined in this act, the director shall state his findings of fact and conclusions of law and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful employment practice or unlawful discrimination and to *take such affirmative action, including, but not limited to,* hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership, in any respondent labor organization, or *extending full and equal accommodations, advantages, facilities, and privileges to all persons, as, in the judgment of the director, will effectuate the purpose of this act, and including a requirement for report of the manner of compliance.* The director shall have the power to use reasonably certain bases, including but not limited to list, catalogue or market prices or values, or contract or advertised terms and conditions, in order to determine particulars or performance in giving appropriate remedy. * * *" (Emphasis supplied).

■■ From all of this it is patently clear that the Legislature intended to create an effective enforcement agency in order to eradicate the cancer of discrimination. Even in the case of an individual complainant, it is plain that the

public interest is also involved. Discrimination, by its very nature, is directed against an entire class in the particular circumstances and wrongful conduct against a complaining individual is indicative of such a state of mind in the wrongdoer against the class. Common knowledge and experience dictate the conclusion, for example, that an apartment owner found to have discriminated because of race in one instance may well have discriminated, and proposes to discriminate, against all others of the class seeking to rent his accommodations. *Robinson v. Branch Brook Manor Apartments, supra* (101 *N. J. Super.*, at 125). So the law seeks not only to give redress to the individual who complains, but moreover to eliminate and prevent all such future conduct on the part of the landlord by enjoining further discriminatory practices as to all persons, as well as to deter others similarly situated from engaging or continuing to engage in such courses of conduct. Thus realistically a cease and desist order must run specifically against the individuals responsible and not just against shifting corporate shells behind which they could try to hide. Likewise posting requirements are needed to inform and protect future rental applicants, and record inspection provisions are necessary to enable ready check of compliance with the public future aspects of a remedial order.[5] Efforts to remain free to discriminate or to hinder the enforcement of the law cannot be tolerated any more than attempted subtle evasions.

Turning finally to the question of the Director's authority to order reimbursement for out-of-pocket loss suffered by an aggrieved individual in a housing accommodation case, we

[5] In this connection we ought to point out that the Director's order of November 21, 1967 directed the respondents to post the specified documents and to make available their rental records for inspection for a period of one year from the date of the order. These directions were stayed pending the outcome of respondents' appeal to the Appellate Division. We do not know whether compliance was resumed after the affirming decision of that tribunal on these points. If not, the Director should be certain that there is compliance therewith for a total period of one year.

disagree with the Appellate Division and are firmly of the view that the Director has power to order the award he did here.

Initially we may say that, at this advanced date in the development of administrative law, we see no constitutional objection to legislative authorization to an administrative agency to award, as incidental relief in connection with a subject delegable to it, money damages, ultimate judicial review thereof being available. *Cf. David v. Vesta Co., supra* (45 *N. J.,* at 323–328).

Basically the question is whether the Legislature intended to give such power to the Director. Although it is not expressly granted in *N. J. S. A.* 10 :5–17, heretofore quoted, an omission which the Appellate Division felt was fatal, we believe the implication is plain enough considering the broad language of the section in the light of the overall design of the act previously outlined. After first declaring that the Director's order shall require the respondent to cease and desist from the particular unlawful discrimination involved, section 17 further provides that the order shall additionally require that a respondent "take such affirmative action * * *, as, in the judgment of the director, will effectuate the purpose of this act * * *." — *i. e.,* positive action not limited simply to an injunction against continuance of the particular unlawful discrimination.

The permissible affirmative action is not fully defined. The section only says "including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership, in any respondent labor organization" — obviously referring to discrimination in employment — "or extending full and equal accommodations, advantages, facilities and privileges to all persons" — undoubtedly referring, in great generality, to affirmative action in cases of unlawful discrimination in housing and places of public accommodation. We have earlier held, in analogous interpretation situations under this act, that terms like "include" are words of enlargement and not of

limitation and that examples specified thereafter are merely illustrative. *Fraser v. Robin Dee Day Camp, supra* (44 *N. J.,* at 485–486) ; *Levitt & Sons, Inc. v. Division Against Discrimination, supra* (31 *N. J.,* at 526). This is especially so here where the word "including" is followed by the phrase "but not limited to".

That the award of money damages for economic loss was not a remedy unthought of by the Legislature is clearly shown by the specific statutory authorization for "back pay" in employment discrimination cases. Incidentally, that language, which appears to have been derived from the National Labor Relations Act, has been construed in cases under that statute to sanction an award to a workman of additional economic employment benefits on the thesis that " '[M]aking the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces.' " *National Labor Relations Board v. Strong,* 393 *U. S.* 357, 359, 89 *S. Ct.* 541, 543, 21 *L. Ed. 2d* 546, 548 (1969).

Nor are we persuaded by respondents' argument, to which the Appellate Division apparently gave weight (101 *N. J. Super.,* at 132), that where compensatory damages in housing discrimination cases are allowed, as in New York and California, the statutes specifically empower such relief, thus indicating a legislative intention to exclude in the absence thereof. A similar argument in an analogous problem of construction was rejected in *Levitt* (31 *N. J.,* at 527) as unpersuasive, and we think it is no more convincing here.

No doubt the most forceful argument in support of the Director's power to award damages is found in the fact that the Legislature, by *L.* 1966, *c.* 17, § 7, inserted this sentence in *N. J. S. A.* 10:5–17:

"The director shall have the power to use reasonably certain bases, including but not limited to list, catalogue or market prices or values, or contract or advertisement terms and conditions, in order to determine particulars or performance in giving appropriate remedy."

It is difficult to conceive of any purpose for the sentence except in connection with the award of compensatory damages in other than employment situations. We believe that it is clear evidence that the Legislature assumed the Director had the power to award such recompense by reason of the previously quoted general language of the section.

Another indication that such is the intended scope of section 17 is found in *N. J. S. A.* 10:5-27, which provides, *inter alia* that "* * * as to practices and acts declared unlawful by section eleven of this act [*N. J. S. A.* 10:5-12], the procedure herein provided shall, while pending, be exclusive; and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned." It thus appears, without dealing completely with all the ramifications of the exclusive remedy provisions of this section, that the complainant here, by pursuing his grievance to completion in the Division, would be barred thereafter from whatever action at law for out-of-pocket losses he might have had by reason of respondents' unlawful discrimination against him.

Finally, it is clear that the judgment reposed in the Director by section 17 to take affirmative action was properly exercised in awarding this complainant the additional rental and traveling expenses he incurred because respondents wrongfully refused to lease him an apartment. Beyond that, we need not go at this time. Most persons in complainant's position are not financially able to pay increased housing costs while a long battle over their rights is being fought. If they are not to be awarded such extra expenses in the discrimination proceedings, they may easily be discouraged in making and pursuing legitimate complaints and, even if they are tenacious, their victory may indeed be an almost pyrrhic one. The Director should now proceed, in accordance with his original order, to ascertain and fix by supplemental order the exact amount of such damages to be paid.

The judgment of the Appellate Division is modified and the matter is remanded to the Division on Civil Rights for further proceedings consistent with this opinion.

*For modification and remandment*—Chief Justice WEIN-TRAUB and Justices JACOBS, FRANCIS, HALL and SCHETTINO —5.

*Opposed*—None.